

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MKM:DGR/TH                              *271 Cadman Plaza East*
F. #2014R00908                          *Brooklyn, New York 11201*

March 21, 2019

By ECF

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:    United States v. Paul Semplice
                       Criminal Docket No. 17-612 (PKC)

Dear Judge Chen:

        The government writes in advance of the defendant Paul Semplice's sentencing hearing in the above-captioned matter and in response to the defendant's March 18, 2019 sentencing letter (Def. Sentencing Ltr. ("Def. Ltr."), ECF No. 34.)  For the reasons set forth below, the government respectfully submits that a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range is necessary to account for the serious crimes committed by the defendant.

        I.      Factual Background

                A.     The Defendant's Membership in the Gambino Crime Family

        The defendant is a long-time inducted member of the Gambino crime family, a violent criminal enterprise that engages in crimes including murder, robbery, extortion and obstruction of justice.  (PSR ¶ 7.)  During a consensually recorded conversation with a cooperating witness (the "CW") on November 18, 2016, the defendant described his position in the enterprise as being under Lorenzo Mannino, a captain in the Gambino crime family:

                CW:          Didn't you tell me a long time ago that Joe was your
                             captain, Gambino?

                SEMPLICE:  No, no.

                CW:          I thought you told me that.

                SEMPLICE:  Lorenzo is mine.  (UI).  I'm (UI) for Lorenzo (UI).

| | |
|---|---|
| CW: | Yeah, that I know.  But I thought Joe was your, your guy. |
| SEMPLICE: | I don't answer to nobody but him. |
| CW: | (UI). |
| SEMPLICE: | Even if he's this or this. |
| CW: | That's the way – |
| | Yeah, yeah, yeah, I gotcha. |
| SEMPLICE: | You understand?  'Cause me and him got a sp – and people know that – we got – and everybody knows.  We got a very special relationship, me and him.  We're like brothers, you know. |
| CW: | You're close to him, sure. |
| SEMPLICE: | And he wants to keep me by his side. |

(PSR ¶ 7.)  In that exchange, the defendant described his "very special relationship" with Mannino and that the defendant "answer[ed] to nobody but him."  Underscoring his allegiance to Mannino and the crime family, the defendant's boasted that the two were "like brothers" and that "everybody knows."

As described in the PSR and set forth herein, consistent with his status within the Gambino crime family, the defendant personally introduced the CW to multiple other "made" members and associates of the Gambino crime family from in the United States and abroad.  (PSR ¶ 7.)  For example, during a November 18, 2016 meeting with the CW, the defendant introduced the CW to the "boss" and "underboss" of an international organized crime family from Italy who the defendant knew to be "Gambino guys."  These formal organized crime introductions can only be made by inducted members, and further reflect the defendant's commitment to organized crime.  (PSR ¶ 7.)

B.     The Defendant's Extortion Scheme

During the charged time period, the defendant engaged in a conspiracy to make extortionate extensions of credit to multiple victims, including John Doe #1 and John Doe #2.  The defendant's role in the conspiracy was documented, in part, in consensual recordings between the CW and the defendant and communications intercepted over the defendant's cellular telephone pursuant to a wiretap.

As to John Doe #1, the defendant's loansharking centered on a $200,000 loan, on which John Doe #1 was required to make regular payments at usurious rates.  In October 2, 2016, during a consensually recorded conversation with the CW, the defendant described his loansharking arrangement with John Doe #1:

2

SEMPLICE:   I told you, I got $200,000 (UI) on the street – one, one guy, one owner, gave that to one guy.  Another guy I gave it to is the big businessman.  I get $4,500 a week, I mean, every two weeks.  That's $9,000 a month I get, right.  (UI)  Are you fucking kidding me?  I give him $1,000 every week, every two weeks.  I'm banking this.  I'm banking $7,000 a month.

CW:   All you need is a few customers like that.

SEMPLICE:   $7,000 a month.  Then I got work, I work, I'll be moving.  I'm doing good.

CW:   Good for you.  I'm really happy to hear that.

SEMPLICE:   Know what I'm saying?  Ya know?  And then I got $5,000 out there to this guy.  $5,000 over there – little, little – yeah, my money that I made with his money.

In that exchange, the defendant discussed his extension of a $200,000 loan to John Doe #1, and explained to the CW how he charged John Doe #1 $9,000 per month (which equates to approximately 54% per year).  In another consensually recorded conversation with the CW, the defendant boasted about his extortionate extension and collection of credit to John Doe #1, telling the CW how he personally made $8,000 a month with "accurate" payments by the victim "every Thursday."  The defendant called the arrangement "a beautiful thing."

As captured over a court-authorized wiretap of his cellular telephone, the defendant made it clear to John Doe #1 that he had to pay and did not accept excuses for non-payment. On January 27, 2017, during an intercepted call, the defendant spoke to John Doe #1 regarding the $200,000 loan and John Doe #1's delayed payments on that loan:

SEMPLICE:   What are you doing, [John Doe #1]?  You busy?  What's going on?  [John Doe #1], What's going on with these payments, [John Doe #1]?  What's going on with these payments?  Money problems again, [John Doe #1]?

DOE#1:   No.

SEMPLICE:   Yeah, [John Doe #1].  Yeah, [John Doe #1].  Yous owe over—[John Doe #1], yous owe over $200,000 in jobs right?

DOE#1:   You'll see it's gonna be paid and then we're gonna be, uh, you know, you'll see next week whatever we told you was gonna happen this week is gonna happen next week—

SEMPLICE:   You know every time it's a story with yous.  [John Doe #1], well, you know, honestly man yous always put me in spots, man, always, always.

DOE#1:   Well—

3

SEMPLICE:    I'm always running around doing the right thing and, uh, it's the same thing, same thing every time we run into this problem.

DOE#1:    It's just a week away.

In the course of his loansharking scheme, the defendant also exploited gamblers, one of whom—John Doe #2—the defendant coldly bragged about "abusing."[1]  In a November 18, 2016 consensually recorded conversation, the defendant detailed some of his loansharking activities to the CW, during which the following exchange occurred:

SEMPLICE:    I'm gonna tell you a story.  I go to Italy last year, the guy owes money.  (UI), the kinda person that would do that.  Motherfucker (UI).  I started abusing him, right.  He was in his forties.  He had the kinda face like – you know.  Once I – I had to smack him.  (UI).  I go, "what?"  Bang!  I go, "(UI), I'll smack you again."  He goes, "why?"  "'Cause I shouldn't have to come see you.  (UI)."

CW:    Uh-huh.

SEMPLICE:    Now I go to Italy.  I go, "listen, if I go to Italy – I forget the vig.  Forget about it.  Just pay me the principal."

CW:    Yeah, he'd just do that.

SEMPLICE:    Every fucking week there was a story.  But, (UI).  Now, he goes, "(UI)", he goes "you're gonna make me die."  "What do you mean?"

CW:    The guy says?

SEMPLICE:    I go, "alright, listen, when I come back from Italy – "  'Cause now, if he tells me, "listen, I'm jammed up."  Be honest with me.  Don't tell me every week, "next week, next week (UI)."

CW:    Yeah, then he's making a jerkoff outta ya.  He's trying to make a jerkoff outta ya.

SEMPLICE:    (speaking over).  You know what I'm saying?  Come on.  That's why I was getting rough with him.  "You lie."  I go – I called him up and I (UI).  "You piece of shit."  He was like – something – I know the guy, he could fucking – $10,000 – maybe, maybe, maybe he gave me $5,000.  I

---

[1]    In his plea agreement, the defendant stipulated that he had made extortionate extensions of credit to John Doe #2 and that, pursuant to U.S.S.G. § 1B1.2(c), this conduct shall be considered by the Court and treated as if he had been convicted of additional counts charging the offense.

get back, I see [Gambino Captain #1],[2] Lorenzo. They go, "he died." "Who died?" "The barber." I felt bad for him. What are you gonna do? He's a degenerate fucking gambler.

CW:        Yeah. The majority of them are like that.

SEMPLICE: I felt bad for him.

CW:        You gave him ten in one shot –

SEMPLICE: [Gambino Captain #1]–

CW:        – or, you gave him 10,000 in one shot?

SEMPLICE: (speaking over) paid 5,000 a day to get me started.

*      *      *

SEMPLICE: [. . .] I used to fucking abuse him. 'Cause now, if we didn't abuse – I don't like abusing people. Don't fuck with me. Be honest. "Listen, I'm jammed up."

CW:        Yeah, he's lying to you.

SEMPLICE: (UI).

CW:        That's what gamblers do.

SEMPLICE: He told me his daughter's sick. His mother, wife got cancer. So he died right when I come back. I felt bad. So anyways, fucking—so [Gambino Captain #1]'s the one that introduced me to him. He felt bad. (UI).

CW:        Yeah.

SEMPLICE: Never introduce me to a fucking guy like that.

CW:        Yeah. That was good. That was nice of you to do that. Not only that, you're close to him too.

SEMPLICE: Close. Now I take 5,000 from him, he felt guilty. But it was nice of him to fucking say, "here, I made you make the (UI)."

CW:        Absolutely, absolutely.

SEMPLICE: But I wasn't taking it from him 'cause he's like my brother. He is my brother, but – I just – I don't know – I go, "Joe." 'Cause [Gambino Captain #1] got involved with it too. I go, "Joe, this guy's jerking – we gonna

---

[2]        Throughout the call, the defendant references an individual who is a captain in the Gambino Crime family, who is hereinafter referred to as "Gambino Captain #1."

|           | fuckin' hurt him." So he went to speak to him. He goes, "(UI). I just want my money." I come back, the guy's dead. Did I feel bad for the guy? Yeah, 'cause he wasn't a bad guy. He was a fuckin' degenerate – |
|-----------|---|
| CW:       | What did he die of? |
| SEMPLICE: | A real Italian guy. A real fucking grease ball. |
| CW:       | What'd he die of? |
| SEMPLICE: | He had a stroke. He died in the barber's chair. He was laying down, and, uh – he used to cut [Gambino Captain #1]'s hair. [Gambino Captain #1] and those guys' hair too. I didn't give a fuck. (UI) the things he used to say to me, that's why I used to spite him. (UI). He threw a (UI) at me. "I could get, I could get people to squash this." |
| CW:       | He said that? |
| SEMPLICE: | I knew he cut this guy's hair. I go, "yeah?" Bang! Go! Not hard, you know. Bang! Go! Go! |
|           | Be honest. I hate when people jerk me. |

In that exchange, the defendant described in detail his extortion of John Doe #2, to whom the defendant extended a $10,000 loan but died before repaying it. The defendant told the CW how Gambino Captain #1 had introduced John Doe #2 to the defendant. Illustrative of the defendant's response to non-payment, when John Doe #2 fell behind on payments, the defendant told Gambino Captain #1 "we're gonna fuckin' hurt him" prompting Gambino Captain #1 to speak John Doe #2. When the defendant returned from a trip to Italy, it was Gambino Captain #1 and Lorenzo Mannino—the person to whom the defendant admitted reporting in the Gambino crime family—who informed the defendant that John Doe #2 had died.

> C.    The Defendant's Narcotics Crimes

The FBI's investigation revealed that, in addition loansharking, the defendant also worked with other members and associates of organized crime to attempt to import narcotics into the United States. In particular, consensually recorded conversations and intercepted telephone calls revealed that the defendant and another associate of the Gambino Crime Family ("CC-1") sought the CW's assistance in trafficking narcotics. The defendant and CC-1 explored with the CW whether the CW could provide a Canadian source for narcotics to be transported from Canada into the United States for sale in New York City by another co-conspirator ("CC-2").

The defendant and CC-1 discussed the trafficking with the CW on multiple occasions, including during in-person meetings both in New York and in Canada. For

example, on October 2, 2016, the defendant, CC-1 and the CW met in New York City, which
meeting was consensually recorded, and the following exchange occurred:

| | |
|---|---|
| SEMPLICE: | We got, we got something good, but I don't want nothin' to do with it.  You can work on it. |
| CC-1: | Yeah. |
| SEMPLICE: | Weed.  Little Mikey, tell him to get weed.  They deliver it. |
| CC-1: | So here? |
| SEMPLICE: | Yeah, yeah. |
| CC-1: | Alright. |
| SEMPLICE: | Whatever you got now – |
| CC-1: | Three, it's way too much. |
| SEMPLICE: | What'd you get in California? |
| CC-1: | Right now you're getting over here (UI) stuff, you're getting 24. |
| SEMPLICE: | Not the good weed? |
| CC-1: | No, high end: Cookie Monster, (UI), or the indoor shit.  Right now delivered here (UI) – |
| SEMPLICE: | (speaking over) They get it here from California? |
| CC-1: | Yeah.  22, 24. |
| SEMPLICE: | 22, 24? |
| CC-1: | Yeah, like anywhere from 23, 24.  Some things come in at 19, but it's like the garbage shit. |
| CW: | Yeah, that's the garbage shit.  This is cush and they said it's triple A. |
| SEMPLICE: | That's the good stuff. |
| CC-1: | Yeah, there's different qualities. |
| SEMPLICE: | 'Cause Mikey said he's paying 4,000. |
| CC-1: | No, 4,000.  It's like impossible.  4,000 is high. |
| SEMPLICE: | Alright.  Find out, find out.  Speak to Mike. |
| CC-1: | And that's, that's usually – people do that on like five.  (UI). |
| SEMPLICE: | What do you wanna do?  Push it to Mikey?  Wanna push it to Mikey? |
| CC-1: | If he's gonna get it for cheaper somewhere else, he's not gonna take it. |

7

SEMPLICE:   But I'm just saying, that's who you want to push it to, Mikey?

CC-1:   There's a couple people.  I could spread the word around, but the thing is –

SEMPLICE:   So, [CW], you know what you do, you go back, right?  See if you could talk to him.  What's the price you're paying over there?

CC-1:   For us to make money here, delivered –

CW:   Delivered?

SEMPLICE:   We're talking about, we're talking about, we're talking quality too.  We're not talking about 50 pounds.  We're talking about 100 pounds, 200.

CC-1:   Yeah, it's gotta be, it's gotta be quality.  If you're talking about delivered here –

CW:   Quantity.

SEMPLICE:   Quantity, yeah.

CC-1:   Quantity.  If we're gonna make money on quantity, we gotta see it at 19, 20.  And then we'll make some money on it, 'cause then we can rock it out 23, 24 all day.  (UI) everybody.  'Cause everybody's falling.  'Cause if you got your direct hook from Cali, like a lot of these kids do, and they mail out 5 and 10, they're seeing already here at between 20 and 24.  They'll see it at that (UI).  If you come in right here with whatever you been dealing with, you know, some from the mail, someone just starts it off –

*     *     *

SEMPLICE:   Listen, this thing's, this thing's ready to rock.

CC-1:   Yeah.

SEMPLICE:   We gotta get together.  Me and him got nothing to do with it.

CC-1:   Yeah, yeah, no, I understand.

*     *     *

CW:   You want me to, you want me to get a price that's between 23 and 24 delivered here?

CC-1:   Yeah.

CW:   That's what you want me to try to get for you.

CC-1:   (UI).

CW:   I'll, I'll ask.  But I don't even wanna –

8

SEMPLICE:    And then you gotta put something on top of ours so, a little bit (UI), you know what I'm saying?

CC-1:    Yeah, because, if we get it at 23, 24, we could put it out at 26.

                                    *    *    *

CW:    But this kid, how is he?  Is he like a (UI)?

SEMPLICE:    He's a little fuckin' (UI).

CC-1:    Nah, he'll (UI), just nuts.

SEMPLICE:    He'll fuck it up.

CW:    But if he's doing it, I mean he's been successful with it?

SEMPLICE:    He's movin', yeah, he moves, he moves a lot.

CC-1:    He moves, he moves, because he's out there.  You understand?  He's out there.  But the good thing is that he's – he'll be out there and then someone and then someone's just feeding him.  I'll tell you because he'll never give up who he, who he's getting it from –

SEMPLICE:    Right, right, right.  Yeah, absolutely.

CC-1:    – because he doesn't want nobody to (UI) –

SEMPLICE:    This conversation, guys –

CW:    Definitely.

CC-1:    Never happened.

SEMPLICE:    This conversation never happened . . .

In this conversation, the defendant and CC-1 outlined the proposed trafficking scheme to the CW.  The defendant and CC-1 told the CW that "Little Mikey" was already importing large quantities of marijuana from California for sale in New York City (SEMPLICE: "He's movin', yeah, he moves, he moves a lot."), and they asked the CW if the CW could get marijuana at a good price in Canada (CW: "You want me to, you want me to get a price that's between 23 and 24 delivered here?"  CC-1: "Yeah, because, if we get it at 23, 24, we could put it out at 26.").  As the defendant and CC-1 discussed, the goal was to get drugs to CC-1 to distribute them through "Little Mikey" (SEMPLICE: "that's who you want to push it to, Mikey?"  CC-1: "There's a couple people.  I could spread the word around.").  The defendant made clear his desire to protect himself, and repeatedly emphasized that CC-1 must not disclose that he and the CW were involved in the trafficking (SEMPLICE: "we got something good, but I don't want nothin' to do with it"; SEMPLICE: "This conversation never happened.").

As reflected in other conversations with the CW and others, the defendant's trafficking scheme was not limited to marijuana.  During the same October 2, 2016 conversation, CC-1 asked the CW about the availability of Ketamine in Canada because, according to CC-1, there was "a major drought" on Ketamine and "kids are going crazy . . .

looking for it."  The defendant also asked CC-1 about the price of cocaine, to which CC-1 responded: "I know right now, the prices right now, will range from anywhere from 35 to 39," meaning $35,000 to $39,000 per kilogram of cocaine.

Later that same day, the defendant again discussed the narcotics trafficking scheme with the CW.  During the consensually recorded conversation, they had the following exchange:

| | |
|---|---|
| CW: | Hey, I don't know what you got going on – with him – but, he's a good kid?  You trust him? |
| SEMPLICE: | Yeah, I trust him with that, yes, yes, yes, totally with that. |
| CW: | 'Cause imagine the bind I'm gonna be in – |
| SEMPLICE: | No, I told him, you and me got nothing to do with it. |
| CW: | We don't. |
| SEMPLICE: | I mean, we got nothing to do with it – just show us the money – that's all. |
| CW: | Now we gotta work on this fucking price. |
| SEMPLICE: | We gotta work on that.  (UI) Negotiate – |
| CW: | Yeah, he might be bullshitting us too.  Not the good, good stuff, but, I gotta do my homework. |
| SEMPLICE: | Do your homework – see what, what you can get.  What do you get it out there for? |
| CW: | If they get (UI) – |
| SEMPLICE: | Let's say, if you get 75 pounds? |
| CW: | It depends.  There's guys out there that make runs, 50 pounds every week here.  50, which is nothing, but every week, consistently every week, that's 200 pounds a month.  Not bad. |
| SEMPLICE: | No, it's not bad if we – yeah, I def – he'd definitely move 50 a week.  Definitely. |
| CW: | It's easy.  Weed. |
| SEMPLICE: | I bet ya if it's good, ya know. |
| CW: | He gets it from California, huh? |
| SEMPLICE: | (UI) California a couple of times. |

During this exchange, the defendant and the CW were discussing narcotics trafficking and obtaining as much as "50 [pounds] a week" of marijuana from Canada for distribution in New York by the CC-2.

10

Following the meetings in New York City with the CW, the defendant arranged a trip to Canada, which occurred in November 18, 2016, during which the defendant met with the CW again and discussed the international narcotics trafficking scheme he had been previously outlining with the CW.  Reflective of the defendant's strong ties to organized crime, it was during this same trip to Canada that the defendant introduced the CW to other members of organized crime and sought out other international organized crime members and associates that could assist in his efforts to import narcotics into the United States.  Although discussions concerning the narcotics trafficking scheme continued for some time, the defendant and CC-1 did not execute their plan with the CW.

II.     Guidelines Range

Consistent with the Guidelines range reflected in the plea agreement, the PSR calculates an applicable Guidelines range of 30 to 37 months, which is based on the following calculation:

Extortionate Extension of Credit Conspiracy

Extortion of John Doe #1

Base Offense Level (§ 2E2.1(a))                                              20

Total:                                                                       20

Extortion of John Doe #2

Base Offense Level (§ 2E2.1(a))                                              20

Total:                                                                       20

Multiple Count Analysis (§ 3D1.2)

Highest Adjusted Offense Level:                                              20

Units:

Extortion of John Doe #1                                                      1

Extortion of John Doe #2                                                      1

Total Units                                                                   2

Plus: Levels Added (§ 3D1.4)                                                 +2

Subtotal:                                                                    <u>22</u>

11

Less: Acceptance of Responsibility (§ 3E1.1(a)–(b))                          -3

Total                                                                              19

Because the defendant is in Criminal History Category I, the resulting Guidelines range is 30 to 37 months.  (PSR ¶ 79.)

III.    Applicable Law

In United States v. Booker, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory.  The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns.  Booker, 543 U.S. at 220; see 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow:  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable.  [The sentencing court] must make an individualized assessment based on the facts presented."  Id. at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.  The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities.  See 18 U.S.C. § 3553(a)(1)–(6).

As the Second Circuit has repeatedly affirmed, a sentencing court fashioning an appropriate sentence enjoys "largely unlimited discretion . . . either as to the kind of

information it may consider, or the source from which it may come." United States v. Cacace, 796 F.3d 176, 190–91 (2d Cir. 2015) (citing United States v. Gomez, 580 F.3d 94, 105 (2d Cir. 2009)). Consistent with that broad discretion, district court's are "free to consider" evidence ranging from the defendant's "uncharged crimes" to his "criminal activity resulting in acquittal." United States v. Bennett, 839 F.3d 153, 161 n.5 (2d Cir. 2016) (citing Gomez, 580 F.3d at 105)).

IV.   Discussion

The defendant, a confirmed soldier in the Gambino crime family, led an extortion conspiracy in which he was responsible for making hundreds of thousands of dollars in usurious loans. As the defendant bragged in recorded conversations, it was his threats, intimidation and willingness to commit violence that ensured his victims paid him, irrespective of whether they owed him $200,000 or $5,000. Considering the full scope of his criminal conduct and for the reasons set forth below, the government respectfully submits that each relevant sentencing factor weighs in favor of a sentence within the Guidelines range of 30 to 37 months.

The defendant's crimes were serious. The defendant targeted business people and gamblers alike, using his reputation and status as a solider in the Gambino crime family to ensure that his victims paid and that he profited. Although the defendant "objects to the accuracy" of the PSR's statements about his membership in the Gambino crime family, (Def. Obj. ¶ 2), given his detailed recorded statements to the CW, there can be no real dispute about his status as a soldier and that it formed the foundation on which he built his criminal scheme. Indeed, it was the defendant's position that helped him to find victims and further his crimes. ("SEMPLICE: . . . [Gambino Captain #1]'s the one that introduced me to [John Doe #2]"; "SEMPLICE: . . . [Gambino Captain #1] got involved with it too. I go, 'Joe, [John Doe #2's] jerking – we gonna fuckin' hurt him.' So he went to speak to him."). The defendant's loansharking crimes are serious on their own, and their seriousness is amplified by their connection to the long-standing and insidious criminal activities of organized crime.

In seeking a substantial departure from the Guidelines range, the defendant characterizes his loansharking as simple, helpful loans to friends and acquaintances. For example, the defendant now casts John Doe #2 not as the "degenerate fucking gambler" he "used to fucking abuse" and called a "piece of shit," but as an "acquaintance who unfortunately had gambling debts." (Def. Ltr. 2.) Similarly, unlike his boasts to the CW about beating John Doe #2 for non-payment, he now characterizes that incident as merely "smooshing" John Doe #2's face. (Id.) Most troublingly, the defendant downplays his loansharking of John Doe #1 as a mere stop-gap loan aimed at helping a company make its payroll. But that simply underscores the fact that loansharks like the defendant target desperate victims who are primed to accept the criminally usurious loans he intentionally offered them. Taken together, these arguments do not reflect contrition or full acceptance of responsibility and do not support the defendant's request for a below-Guidelines sentence.

The history and characteristics of the defendant further demonstrate the need for a sentence within the applicable Guidelines range. In seeking a downward departure, the defendant highlights, among other things, the fact that his extortion scheme was "his only criminal charge in 55 years." (Def. PSR Obj. ¶ 9.) Although, as a legal matter, that is technically true, as a factual matter, intercepted telephone calls and consensual recordings of the defendant more accurately depict an individual who, simply, has been caught only once in 55 years. As detailed above, the recordings of the defendant not only provided clear evidence of the charged crimes, but also of the defendant's concerted efforts to import and traffic dangerous drugs into the United States, all with the help of other members and associates of organized crime.

This conduct is highly relevant to fashioning the appropriate sentence here, as it throws into sharp relief the picture the defendant paints for the Court. In particular, it shows that, contrary to the defendant's claims, his loansharking crimes were not merely a passing moment in an otherwise exemplary life; they were just one part of the crimes the defendant was eager to commit as a member of the Gambino crime family. A full and accurate accounting of this history is critical, where, as here, the defendant repeatedly points to his age, health and family as reasons for this Court to impose a non-Guidelines sentence. As the record makes clear, it was law enforcement that impeded the defendant's criminal conduct, not any of the factors he now cites.

Accordingly, because each sentencing factor supports the need for a Guidelines sentence, the Court should reject the defendant's requests to depart "substantially below" the Guidelines range and impose a sentence of imprisonment within the applicable Guidelines range.

V.      Conclusion

For the reasons set forth above, the government respectfully requests that the Court sentence the defendant within the applicable Guidelines range of 30 to 37 months' imprisonment.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
Tanya Hajjar
Drew G. Rolle
Assistant U.S. Attorneys
(718) 254-7000

14

cc:     Allen Frankel, Esq. (by ECF)
        Patricia Sullivan (U.S. Probation Department) (by Email)